UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH COLIN McWILLIAMS and JUAN B. GOMEZ,

Plaintiffs,

- *against* -

MICHAEL STAPLETON ASSOCIATES, LTD., doing business as MSA SECURITY, VINCENT DESANTIS, MICHAEL MALLON, PETER DEEGAN, and MICHAEL O'NEILL,

Defendants.

Complaint and
Demand for Jury Trial

Docket No:

Plaintiffs, as and for their complaint against defendants, allege as follows:

## **Introduction**

1. This is an action to recover damages and for injunctive relief. This action is brought based upon the defendants' egregious violations of the anti-retaliation provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*., and New York Labor Law ("NYLL"), NYLL § 215. Defendants illegally terminated plaintiffs for exercising their statutory rights to be fully paid for their unpaid overtime and other wages.

## **The Parties, Jurisdiction and Venue**

2. Defendant Michael Stapleton Associates, Ltd. d/b/a MSA Security ("MSA") is a foreign corporation registered in the State of New York. Its principal place of business is 9 Murray Street, New York, NY 10007.

3. Defendant Vincent DeSantis ("DeSantis") is the Manager of Canine Operations of MSA. Upon information and belief, he supervises all of MSA's dog handlers and exercises substantial control over the scheduling and operational procedures of all of MSA's dog handlers.

Upon information and belief, his business address is 9 Murray Street, New York, NY 10007. Upon information and belief, DeSantis is a citizen and resident of the State of New York.

4. Defendant Michael Mallon ("Mallon") is an EDC Account Manager for MSA. Upon information and belief, he supervises all MSA dog handlers assigned to his accounts (including the Staten Island Ferry) and exercises substantial control over the scheduling and operational procedures of such dog handlers. Upon information and belief, his business address is 9 Murray Street, New York, NY 10007. Upon information and belief, Mallon is a citizen and resident of the State of New York.

5. Defendant Peter Deegan ("Deegan") is the Director of Human Resources for MSA. Upon information and belief, he supervises and handles all human resource matters (including suspensions and other discipline) regarding MSA's dog handlers. Upon information and belief, his business address is 9 Murray Street, New York, NY 10007. Upon information and belief, Deegan is a citizen and resident of the State of New York.

6. Defendant Michael O'Neill ("O'Neill") is the Chief Executive Officer of MSA. Upon information and belief, he exercises substantial control over the operations of MSA, authorizes and implements the procedures and policies of MSA and, through the officers, directors and supervisors under his direct control and supervision, has final authority and control over all of the employees of MSA, including hiring and firing decisions. Upon information and belief, his business address is 9 Murray Street, New York, NY 10007. Upon information and belief, O'Neill is a citizen and resident of the State of New York.

7. Upon information and belief, MSA is a broad-based security firm with over 850 employees. MSA specializes in canine services, i.e., bomb-sniffing dogs, and claims to be one of the largest of its kind in the nation.

8. Upon information and belief, MSA has annual revenues substantially in excess of Eleven Million Dollars ($11,000,000.00) from government contracts alone. MSA is an enterprise actively engaged in interstate and international commerce.

9. MSA is an "employer" under NYLL § 651(6).

10. MSA is an "employer" under 29 U.S.C. § 203(d).

11. O'Neill is an "employer" under NYLL § 651(6).

12. O'Neill is an "employer" under 29 U.S.C. § 203(d).

13. Plaintiffs were "employees" of MSA under NYLL § 651(5).

14. Plaintiffs were "employees" under 29 U.S.C. § 203(e).

15. Plaintiffs were employed by defendants as handlers of bomb-sniffing dogs.

16. According to MSA, "MSA's full-time team of EDC handlers carries both military and law enforcement backgrounds. Before they begin working with MSA dogs, they undergo extensive training in Explosive Detection, Counter Surveillance and Behavior Pattern Recognition. They receive continuing education and training to successfully address the ever-evolving threat of IEDs."

17. Plaintiff JOSEPH C. McWILLIAMS ("McWilliams") is a citizen of the State of New York residing at 8907 34th Avenue Apt. 4N, Jackson Heights, NY 11372.

18. McWilliams is a former employee of MSA, serving as a bomb-sniffing dog handler from 2016 to August 2017. Prior to being employed by MSA, McWilliams served in MARSOC, the special operations force of the United States Marine Corps. During his seven years of service, McWilliams was repeatedly deployed to combat zones throughout the world, including Iraq, where he fought in the Battle of Marjah. During his service with MARSOC, he was awarded a Purple

Heart for the wounds he suffered, and was also awarded a Bronze Star with a combat V for his acts of valor in combat in Afghanistan.

19. Plaintiff JUAN B. GOMEZ ("Gomez") is a citizen of the State of New York residing at 201 West Kingsbridge Road, Bronx, NY 10463.

20. Gomez is a former employee of MSA, serving as a bomb-sniffing dog handler from 2016 until he was constructively discharged in August 2017. Prior to being employed by MSA, Gomez served four years in the United States Marine Corps and was deployed to combat zones.

21. Subject matter jurisdiction exists with respect to this action pursuant to 29 U.S.C. § 216(b) and 28 U.S.C.§ 1331. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the claims brought under the anti-retaliation provisions of the NYLL.

22. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events giving rise to the claims herein occurred within this district, and pursuant to 18 U.S.C. § 1965 in that defendants' principal places of business are within this district and defendants transact their affairs within this district.

23. Personal jurisdiction exists pursuant to CPLR §§ 301 and 302 because defendants' principal places of business are within New York, and the claims hereunder arise out of defendants' transaction of business in New York.

24. This action is directly related under Fed. R. Civ. P. 40.2(a)(1) to the previously filed action pending in this Court entitled *Barrett, et al. v. Michael Stapleton Associates, Ltd., et al.,* Case No. 17-CV-05468 (AJN) (the "Barrett Action").

**<u>Factual Background</u>**

25. Plaintiffs began working for MSA in 2016.

26. During their training and orientation, MSA told plaintiffs that they would only receive hourly pay for the exact time of their scheduled shift. MSA further told plaintiffs that they

would not be paid for the time during their day when they drove from one job-site to another, nor would they be paid for training time.

27. MSA also told plaintiffs that they were required to report for duty at their job-site and be on the floor working 30 minutes prior to the scheduled time of their shifts. Plaintiffs were primarily assigned to the 1 pm to 9 pm shift at the Staten Island Ferry. They were told to sign in "1300" (1 pm) and sign out "2100" (9 pm) in the logbook at the Staten Island Ferry when they arrived to work.

28. When McWilliams heard that he was not going to be paid for his time spent traveling from one job-site to another, and that he was required to begin working off the clock 30 minutes before his shift started, he told MSA "you're going to get sued."

29. Sometime in 2017, defendants began using an electronic time card system named Vantage which used the clock and GPS features of the plaintiffs' mobile phones to show when plaintiffs arrived at the Staten Island Ferry and began working.

30. Despite the use of Vantage, defendants continued to require plaintiffs to sign in on the logbook at 1 pm, and only paid them starting at 1 pm.

31. When plaintiffs protested, MSA told them that working before the scheduled start of their shift was company policy designed to ensure proper coverage during shift changes.

32. As of May 22, 2017, plaintiffs were full-time employees of MSA.

33. On or about May 22, 2017, defendants were sued in a proposed collective action seeking relief under the FLSA in the Northern District of Texas by a Texas-based dog handler. *Blackmon v. Michael Stapleton Associates, Ltd., et al.*, Case No. 17-CV-1362 (the "Blackmon Action"). The sole count of the original complaint filed in the Blackmon Action was a claim for unpaid overtime under the FLSA.

34. As of July 18, 2017, plaintiffs were full-time employees of MSA.

35. On or about July 18, 2017, the Barrett Action was filed. The Barrett Action seeks recovery of unpaid wages and overtime for a collective under the FLSA. Unlike the original complaint in the Blackmon Action, the Barrett Action raised additional claims under the NYLL seeking relief for a class of dog handlers.

36. On or about July 25, 2017, opt-in forms signed by the plaintiffs were filed in the Blackmon Action.

37. After plaintiffs became aware of the Barrett Action, they signed and filed opt-in forms to join the Barrett Action. Plaintiffs also openly urged other MSA employees to support the Barrett Action. Plaintiffs further openly supported efforts to unionize the MSA dog handlers, and encouraged others to sign cards in support of unionization.

38. Defendants began retaliating against plaintiffs shortly after the Blackmon and Barrett Actions were filed, and, upon information and belief, sought to "make an example" of plaintiffs to "send a message" to other MSA dog handlers that they should decline to participate in the Barrett Action and unionization efforts.

39. This retaliation included requesting the resignation of McWilliams because of his upcoming military service. McWilliams refused to resign.

40. Upon information and belief, defendants actively sought out a pretext that would allegedly justify plaintiffs' discharge.

41. At the Staten Island Ferry, MSA dog handlers work in group of three handlers per shift.

42. At the Staten Island Ferry, MSA dog handlers receive a one hour break each shift, but for those who work the 1 pm to 9 pm shift at that location, the hour must be split in two breaks of thirty minutes each.

43. Due to the location, thirty minutes is insufficient time for the dog handlers to find and eat their meals. It is also insufficient time for the dogs to rest.

44. During the work week, especially at peak commuting hours, the Staten Island Ferry is extremely crowded. Plaintiffs were instructed by MSA to inspect approximately one in ten passengers before they board.

45. On the weekends, the Staten Island Ferry has far fewer passengers.

46. At the Staten Island Ferry, two MSA dog handlers typically work on the passenger level. The third dog handler typically works on the less-crowded lower level, which has bicycles but no passengers.

47. At the Staten Island Ferry, two dog handlers remain on duty during the break times of the other dog handler. The two on duty handlers remain on the main passenger level during the break of the third.

48. On a Saturday in mid-August, 2017, plaintiffs were working together on the 1 pm to 9 pm shift at the Staten Island Ferry with a third dog handler.

49. The three dog handlers each agreed that the half hour breaks were insufficient time for them, so – since it was not busy that day -- they agreed to each take their one-hour break all at once.

50. At no point on this day were there fewer than two dog handlers on the main passenger level.

51. MSA became aware that the three handlers combined their breaks, and took action against the plaintiffs, but not against the third handler.

52. Upon information and belief, the third handler combined his breaks in the same way the very next day. When he was caught doing so again, Mallon told the third handler in the presence of others that he “wasn’t in trouble.” Upon information and belief, MSA’s sole reprimand or discipline of the third handler for these two violations was Mallon telling him “just don’t do it anymore.”

53. The third handler did not submit an opt-in form in either the Bennett or Blackmon Actions, nor did he sign a card seeking unionization.

54. Up until the incident, plaintiffs each had an unblemished record with MSA.

55. McWilliams was discharged by MSA in late August, 2017. An additional stated reason for his discharge was a complaint by a passenger who was upset when McWilliams followed the instructions of the on-site head of security at the Staten Island Ferry in screening passengers, as he was required by MSA to do. The complaining passenger did not miss the departure of the ferry she was waiting in line to board.

56. After a meeting with DeSantis in late August, 2017, Gomez was placed on indefinite suspension and therefore constructively discharged,.

57. Even though Gomez was “only” suspended for taking his permitted break once instead of splitting it two, MSA immediately removed his dog (Barney) away from his home, where Barney was considered by Gomez, his wife, and their 4-year-old daughter to be a member of their family.

58. After he was suspended. Gomez had telephone conferences with Deegan, who told Gomez that he was looking into obtaining video footage of the Staten Island Ferry and that Gomez

would remain on suspension until he completed his investigation. He also told Gomez that there may be other "violations" that would be revealed by video review of jobsites. Gomez told Deegan that he committed no other violations, and in fact Deegan raised no other violations to Gomez.

59. Upon information and belief, Deegan conducted no investigation into any alleged violation by Gomez, including the event at the Staten Island Ferry that was purportedly the basis for his indefinite suspension.

60. At the time of the defendants' retaliation against the plaintiffs for engaging in activity protected under applicable law, they had been served with both the Barrett and Blackmon Actions, and had retained experienced and knowledgeable counsel to represent them in the actions. Thus, defendants' acts were done with the conscious knowledge that such retaliation violated the law, or was such egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn. The defendants' actions were not only retaliatory, but were done with the purpose of "sending a message" to other dog handlers. In other words, not only did the defendants retaliate against the plaintiffs, they did so deliberately in order to intimidate other dog handlers from participating in lawsuits under the FLSA and NYLL, as well as lawful efforts towards unionization of MSA employees.

## COUNT ONE
## (FLSA RETALIATION)

61. Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 60 as if set forth in full herein.

62. Pursuant to 29 U.S.C. § 215(a)(3), it is unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter."

63. As described above, defendants discharged the plaintiffs in retaliation for engaging in legally-protected activity, such as participating as opt-in plaintiffs in the Barrett Action.

64. Pursuant to 29 U.S.C. § 216(b), defendants are liable to plaintiffs for "such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages," and attorneys' fees and costs.

65. By the foregoing reasons, defendants are liable to plaintiffs in an amount to be determined at trial, plus liquidated damages, punitive damages, interest, attorneys' fees, and costs.

## COUNT TWO
## (NYLL RETALIATION)

66. Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 65 hereof.

67. Pursuant to NYLL § 215(1)(a), "[n]o employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee … (iii) because such employee has caused to be instituted or is about to institute a proceeding under or related to this chapter."

68. As described above, defendants discharged the plaintiffs in retaliation for engaging in legally-protected activity regarding the Barrett Action.

69. Pursuant to NYLL § 215(2)(a), defendants are liable to plaintiffs for an award of front pay in lieu of reinstatement, an award of lost compensation and damages, liquidated damages, costs, and attorneys' fees. Defendants are also subject to entry of an order enjoining retaliatory conduct.

70. By the foregoing reasons, defendants are liable to plaintiffs in an amount to be determined at trial, plus injunctive relief, punitive damages, liquidated damages, interest, attorneys' fees, and costs.

WHEREFORE, plaintiffs demand judgment:

(1) Awarding them their damages, front pay, punitive damages, and liquidated damages as set forth in federal and state law, plus pre and post judgment interest,

(2) The right to collect attorneys' fees in collecting such judgment, as provided in NYLL § 198(4) and a provision pursuant to NYLL § 198(4) that any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen percent.

(3) For an award of injunctive relief against the defendants as this Court deems appropriate to prevent future violations of New York Labor Law.

(4) Together with such other and further relief as to the Court seems just and proper, including costs, disbursements, and attorneys' fees incurred by plaintiffs herein.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs demand trial by jury in this action of all issues so triable.

Dated: New York, New York
September 29, 2017

KUDMAN TRACHTEN ALOE LLP

By____________________
Paul H. Aloe (PA-6088)
Francis M. Curran (FC-1158)
Attorneys for Plaintiffs
350 Fifth Avenue, 68th Floor
New York, New York 10118
(212) 868-1010

*Of Counsel:*

David I. Aboulafia (DA-7886)
228 East 45th Street
Suite 1700
New York, New York 10017
(212) 684-1422